## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **STATE FARM FIRE AND** | ) | |
| **CASUALTY CO.,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 09-0267-KD-C** |
| **v.** | ) | |
| | ) | |
| **GERTRUDE BILLINGSLEY,** | ) | |
| **Defendant.** | ) | |

## ORDER

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Docs. 16-18), Defendant's response (Docs. 20-25), Plaintiff's reply (Doc. 26) and Plaintiff's response to the Court's show cause order (Doc. 31).

### I.    Relevant Background

### A.    Procedural History

Plaintiff State Farm Fire and Casualty Company ("State Farm") initiated this litigation on May 12, 2009, by filing a Complaint for a declaratory judgment against Defendant Gertrude Billingsley ("Billingsley"), alleging that the $120,300 insurance policy it issued to Billingsley for her manufactured home ($60,000 for dwelling and $60,300 for contents) is void and that State Farm is not obligated to pay any benefits to her based upon her misrepresentations and concealment after a fire loss on September 5, 2008. (Doc. 1). Specifically, State Farm alleges that Billingsley submitted documentation in the form of Proof of Loss and Personal Property Inventory Forms falsely claiming contents valued at more than $60,000 were destroyed in the fire. (Id.) State Farm asserts further, that it paid $2,780.80 to Billingsley or on her behalf for Additional Living Expenses as well as advanced Billingsley $4,250 to be applied to the contents coverage, and that it is entitled to receive from Billingsley the benefits previously paid to or on her behalf. (Id.) As relief, State

Farm seeks a declaration from this Court that the policy is void, that it has no duty to pay any insurance benefits to Billingsley as a result of the loss, and that Billingsley must repay to State Farm the $7,030.80 that it paid to or on behalf of Billingsley. (Id.) In her Answer, Billingsley denies State Farm's allegations and asserts a counterclaim against State Farm for breach of contract and bad faith for State Farm's failure to pay the full amount on the policy, alleging that State Farm's assertion of misrepresentation was merely pretext to deny her claim and that she is due to be paid the full amounts under her policy. (Doc. 7).

**B.** **Factual History**

In 2006, Gertrude Billingsley purchased a manufactured home (mobile home). (Doc. 16-2 at Ex. D at 50-51 (Examination Under Oath ("EUO") at 33-34)). The mobile home was placed on land that Billingsley's mother-in-law, Marie Billingsley, deeded to her and her husband in Selma, Alabma. (Doc. 24-1 at Ex. E at 8 (Dep. M.Billingsley at 24)).

On April 24, 2007, Billingsley filed a Chapter 13 bankruptcy proceeding in the United States District Court for the Southern Division of Alabama (Case No. 0711090). (Doc. 16-1 at 5-54 (Ex. A1)). In the bankruptcy proceeding, Billingsley represented to the Bankruptcy Court under penalty of perjury that she owned personal property valued at $6,774, consisting of $6,000 (the value of a 2000 Chevrolet Impala) and personal contents/household goods valued at $774 ($50 in clothing, $50 in jewelry, $665 in household goods and furnishings and $9 in a Riverdale Credit Union savings account). (Id. at 23-25). Billingsley indicated in her bankruptcy filings that she was unemployed[1] but that her family's monthly income was $962 because her son receives social security in the

---

[1] She was previously employed as a CNA with Bibb Medical and Southland. (Doc. 16-2 at Ex. C at 45-46 (Dep. Billingsley at 60-61)).

amount of $235/month and her husband receives social security in the amount of $727/month. (Id. at 40). On September 28, 2007, the Bankruptcy Court entered an Order confirming Billingsley's plan and discharging all her debts unless allowed by the plan. (Doc. 16-1 at Ex. A6 at 83-84). However, on December 7, 2007, Billingsley's bankruptcy was dismissed due to her failure to make payments. (Id.)

In April 2008, 21st Century Mortgage Company declared Billingsley's mortgage in default. (Doc. 1 at 3). In May 2008, Billinglsey was sued by Contemporary Mitsubishi in the Circuit Court of Tuscaloosa, Alabama (CV 2008-556) for breach of contract. (Doc. 16-1 at Ex. A4).

In June 2008, Billingsley's husband received a lump sum payment of $9,000 (part of an annual payment of a settlement with Skinner furniture due to a head injury he received from the store's owner) and Billingsley "used some of the money that she had got back from her income tax[]" and bought "new stuff" including a new living room suite and a little table and another television stand." (Doc. 16-2 at Ex. H at 76 (Dep. S.Ford at 13); Doc. 21-1 at ¶11 (Aff. Billingsley); Doc. 23-1 at Ex. F at 4 (Dep. S.Ford at 15)). Selena Ford ("Ford"), Billingsley's cousin, testified that Billingsley had a living room suite, bedroom suite, a king-sized suite in the master bedroom, pictures on the walls, games for her son, dishes and china, barbecue grill, mixers, blenders and cooking utensils – that her house was fully furnished. (Doc. 23-1 at Ex. F at 6-7 (Dep. S.Ford at 17-18)). Ford testified that Billingsley made lots of purchases: "[i]f it look good, she's going to buy it . . . [a]nd half of the things she couldn't use . . . [b]ut that's her . . . She's going to spend her money to the use. She take care of her baby and her house. It was decked out. Too pretty." (Id. at 11 (Dep. S.Ford at 23)).

On July 28, 2008, Billingsley obtained a Manufactured Home Insurance Policy (#01-BB-

F151) from State Farm (Policy #01-BB-F151), insuring her manufactured home (16' x 76' in size) and contents located at 2724 County Road 27, Selma, Alabama. (Doc. 1 at 2; Doc. 7 at 6; Doc. 16-1 at Ex. B and Ex. A3 at 60; Doc. 21-2 at ¶4 (Aff. Billingsley); Doc. 25-1 at 1, 5 (Dep. G.Billingsley at 48, 52)). State Farm provided insurance to the dwelling with limits of $60,000 and insurance to contents with limits of $60,300. (Id.) The policy issued by State Farm to Billingsley for the manufactured home contained the following relevant conditions:

> SECTION I - SECTION II CONDITIONS
> * * *
> 2. Concealment or Fraud. This policy is void as to you and any other insured if you or any other insured under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after the loss.

(Doc. 16-2 at 24 (Ex. B)).

On September 5, 2008, a fire completely destroyed Billingsley's home and the contents inside the home, including her paperwork. (Doc. 1 at 2; Doc. 7 at 6; Doc. 16-2 at Ex. C at 37 (Dep. Billingsley at 12); Doc. 21-2 at 1 (Aff. Billingsley at ¶5)). At that time, Billingsley was in arrears on her mortgage in the amount of $1,293. (Doc. 1 at 3; Doc. 16-1 at 60 (Ex. A3)). About a week after the fire, State Farm paid Billingsley approximately $7,000 for living expenses. (Doc. 7 at 8; Doc. 21-1 at 1 (Aff. Billingsley at ¶7); Doc. 25-1 at Ex. D at 7 (Dep. G.Billingsley at 54)). Specifically, State Farm paid $2,780.80 for Additional Living Expenses and advanced $4,250 for the contents coverage. (Doc. 1 at 4; Doc. 16-1 at 59 (Ex. A3)).[2]

On November 3, 2008, Billingsley submitted documentation to State Farm in the form of a 14 page sworn Personal Property Inventory Form ("PPIF"), detailing the contents of her mobile

---

[2] Billingsley represents that State Farm also later paid an estimated $18,000 to 21st Century Mortgage. (Doc. 7 at 8, 9).

home at the time of the fire. (Doc. 16-1 at 69-82 (Ex. A5)). In the PPIF, Billingsley claimed

contents valued in excess of $60,000[3] acquired within 1-3 years of the fire, as having been

destroyed. (Id.; see also Doc. 16-2 at Ex. D at 59, 75, 77). Notably, items listed on the PPIF which

Billingsley claims that she acquired within the year between September 5, 2007 and September 5,

2008 (i.e., after she filed for bankruptcy and before the fire), include the following:

- two Vinlyn drapes (green) ($200);
- one Vinlyn scafe ($200);
- one crystal chandelier from Lighten's ($800);
- a host of curtains by Worthington from JCPenny ($1300);
- a host of bedspreads/comforters by Worthington from JCPenny ($2500);
- a host of family portraits ($2500);
- four synthetic trees from Spiller Furniture ($99);
- two apple case knife sets from the flea market ($100);
- four apple canister sets from the flea market ($50);
- two apple board sets from Walmart ($60);
- two cherry finish counters from Service Merchandise ($120);
- four apple window curtains from TJ Maxx ($150);
- one round Carliot rug 6 feet from TJ Maxx ($150);
- two apple towel racks from TJ Maxx ($75 each);
- three apple mix and match mittens from Walmart ($35 each);
- two crystal dish sets from TJ Maxx ($95 each);
- four white glass champagne glasses from TJ Max ($70 each);
- men's Cougi jacket from TJ Maxx ($80);
- Baby Phat jeans from the flea market ($50);
- Baby Phat shirt from the flea market ($38);
- Baby Phat bag from the flea market ($60);
- Baby Phat skirt from the flea market ($45);
- Apple Bottom jeans from Citi Trend ($45);
- Apple Bottom shirt from Citi Trend ($30);
- Girbaud Jeans from the flea market ($80);
- Girbaud shirt from the flea market ($50);
- Girbaud shorts from the flea market ($50);
- Baby Phat jeans from Factory Connection ($50);
- Baby Phat underwear from Factory Connection ($25);
- Rowenta toaster 4 slice from JC Penny ($44);
- Euro-pro food processor/blender from JC Penny ($189);
- Bunn home brewing system from JC Penny ($99);
- Professional series mixer from JC Penny ($369);

---

[3] State Farm actually asserts that the items in Billingsley's PPIF come to a total of $89,831.81 in personal property. (Doc. 26 at 2, n.1).

- Circulon 10 pc set from Service Merchandise ($179);
- Fabarware millenium blue from Sears ($149);
- 20 piece Fiesta set from JC Penny ($74.49);
- Kitchen pantry from Sears ($149.99);
- Spice rack with spices from Sears ($99);
- three pairs of Nike Air Max shoes from East Bay ($110 each);
- two pairs of Dada Rah Rah shoes from East Bay ($50 each);
- Rockport leather Amigo shoes from East Bay ($80:
- SAO Warrior shoes from East Bay ($120);
- four pairs of Timberland boots from East Bay ($45 each);
- two pairs of Jordan shoes from East Bay ($120 each);
- men's coat from TJ Maxx ($90);
- two Opulence prints (36"x86") from Home Interiors ($139);[4]
- two Magnolian pictures from Home Interiors ($149);
- four Coach handbags from Macy's ($80);
- Sony 60-disc shelf from Radio Shack ($250);[5]
- Minolta Freedom Silver 35 mm camera from Walmart ($300);[6]
- Phillips TV/DVD/VCR combo from Walmart ($400);[7]
- a Scrambler bike from Walmart ($100);
- a Mountain Climber bike from Sears ($225):
- a motor massage cushion from Sears ($75);
- a thermal spa mat from Sears ($90);
- a Cybersonic Oral care system from McRae's ($90);
- XBox 360 from Walmart ($450);
- a host of XBox games from Game Stop and Walmart ($1800);
- Play Station III from Game Stop ($600);
- Home entertainment set from Circuit City ($1200);
- Kodak digital camera from Walmart ($350);
- Apple Ipod from Circuit City ($250);
- two DVD/VCR combo sets from Walmart ($279);
- Bissel Steam Vacuum from Walmart ($329);
- Oreck Vacuum ($279);
- towel stacker from Goodys ($59);
- two Taylor bathrugs 6x9 from Sears ($98);
- Harbor bathrug from Sears ($34);

---

[4] Billingsley stated in her EUO that her mother-in-law gifted to her four pictures from Home Interior. (Doc. 16-2 at Ex. D at 56 (EUO at 62-64)).

[5] Billingsley stated in her EUO that her mother gifted this item to her. (Doc. 16-2 at Ex. D at 59 (EUO at 86)).

[6] Billingsley stated in her EUO that she purchased this item. (Doc. 16-2 at Ex. D at 59 (EUO at 87-88)).

[7] Billingsley testified at her 2009 deposition that her mother-in-law gifted the TV combo to her in the one-year timeframe. (Doc. 16-2 at 39-30 (Dep. Billingsley at 17-18)). However, she stated in her previous 2008 EUO that she purchased this item. (Doc. 16-2 at Ex. D at 59 (EUO at 88-89)).

6

- Rowenta bath scale from TJ Maxx ($100);
- a host of new towels never been used from Service Merchandise ($300);
- four double panel shower curtains from Sears ($69);
- space saver from McRaes ($79);
- Francillia space saver from JK Savings ($83);[8]
- round hamper from Service Merchandise ($59);
- standard hamper from Service Merchandise ($78);
- Radiance 8 x 11' picture from JC Penny ($599);[9]
- Rivera Silk 2'6"x8' rug from JC Penny ($398);
- Camelot round rug 7x10' from JC Penny ($469);[10]
- pleated drapery sets from JC Penny ($150);
- two 42 x 84 Imperial Scarf Panel from JC Penny ($80 each);
- three home flower arrangements from Home Interiors ($180 each);
- four 22 x 28" pictures from Home Interiors ($200 each);
- eight wall candle holders from Home Interiors ($75 each);
- two five-piece bed comforter set from JC Penny ($125 each);
- 12x12' oriental rug from flea market ($150);
- two pairs Nike Mission retro shoes from Athlete's Foot ($89 each);
- two pairs Nike Air Zoom shoes from Athlete's Foot ($89 each);
- one Nike Air Flight shoes from Athlete's Foot ($70 each);
- three pairs Nike Shox shoes from Athlete's Foot ($70 each);
- six pairs K-Swiss shoes from Athlete's Foot ($40 each);
- four pairs Timberland boots from Athlete's Foot ($120 each);
- four pairs Air Forces shoes from Foot Locker ($60 each);
- six pairs Reebok shoes from Shoe Station ($45 each);
- three KIK lamp sets from Walmart ($69 each);
- two double panel shower curtains from JC Penney ($90 each);
- Bali shower curtain from JC Penny ($90);
- two Taylor bathrugs 6x9' from Sears ($115 each);
- two round hampers from JC Penny ($75);
- instant extra storage 60" from TJ Maxx ($40);
- two towel stackers from TJ Maxx ($60 each);
- two standard hampers from Walmart ($65 each);
- two Rowenta bath scales from Walmart ($75 each);
- three Franciillia space savers from Service Merchandise ($83 each);
- four wall pictures from Home Interiors ($450);
- two Coogi men's jackets from TJ Maxx ($80 each);
- five Baby Phat jeans from flea market ($50 each);
- seven Baby Phat shirts from flea market ($38 each);

---

[8] Billingsley testified at her deposition that her other cousin Kimberly "Lilly" Ford (cousin Selena Ford's sister) gifted this item to her. (Doc. 25-1 at Ex. D at 25 (Dep. G.Billingsley at 73)).

[9] Billingsley stated in her EUO that her mother gifted this item to her. (Doc. 16-2 at Ex. D at 61 (EUO at 102)).

[10] Billingsley stated in her EUO that this item was a curtain and that her mother gifted this item to her. (Doc. 16-2 at Ex. D at 61 (EUO at 103)).

- two Baby Phat bags from flea market ($60 each);
- five Baby Phat skirts from Citi Trend ($45 each);
- six Apple Bottom Jeans from CitiTrend ($45 each);
- six Apple Bottom shirts from TJ Maxx ($30 each);
- three Girbaud jeans from flea market ($80 each);
- four Girbaud shirts from flea market ($50 each);
- two Girbaud shorts from flea market ($50 each);
- 12 Coogi jeans from flea market ($80 each);
- 12 Coogi shirts from flea market ($65 each);
- seven Coogi shorts ($68);
- telephone from Walmart ($60);
- one baker's rack from Walmart ($150);
- "personal belongs" from Walmart ($600);
-  Flower & Flower from Home Interior ($340);
- Playstation from Toys-R-Us ($235); and
- a host of Playstation tapes ($600).

(Doc. 16-1 at 69-82 (Ex. A5)).[11]  Based on the information Billingsley provided in the PPIF, these "one-year" items come to a total of $34,483.48 in "contents" of the mobile home as acquired within one year before the fire.

Billingsley had no documentation (receipts or cancelled checks) showing what was inside her home when the fire occurred.  (Doc. 16-2 at 37 (Dep. Billingsley at 12); Doc. 16-2 at Ex. D at 49 (EUO at 7-8)).  Nevertheless, both Marie Billingsley (Billingsley's mother-in-law) and Selena Ford (Billingsley's cousin) testified that she had "lots more" than $774 in household items/personal goods in her mobile home at the time of the fire.  (Doc. 24-1 at Ex. E at 9 (Dep. M.Billingsley at 25)); Doc. 23-1 at Ex. F at 8 (Dep. S.Ford at 20)).  Billingsley also stated in her Affidavit that she had "good things before the fire that were given to me by family members[.]" (Doc. 21-1 at ¶11 (Aff. Billingsley)).  Billingsley testified that if State Farm contends that she owned only $774 worth of items at the time of the fire (based on her bankruptcy filing), that would not be correct.  (Doc. 25-

---

[11]  Billingsley stated that she purchased the Coogi jacket, Baby Phat, Girbaud and Apple Bottom clothing, adding that she has about 200 pairs of jeans. (Doc. 16-2 at Ex. D at 58 (EUO at 76-77)). She added during her EUO that she mistakenly wrote "GPX home music system from Radio Shack ($175)" on the contents list but it was really the same thing as the Phillips home system. (Id. at 59 (EUO at 87)).

1 at 15 (Dep. G.Billingsley at 62)).

On November 7, 2008, Billingsley completed a Sworn Statement in Proof of Loss form, for policy #01BBF1511 effective from June 28, 2008-June 28, 2009, in which she listed the actual loss and damages as $67,000 (for her dwelling) and $72,000 (for her contents), for a total sum of $139,000. (Doc. 31-1).

On November 24, 2008, Billingsley completed another Sworn Statement in Proof of Loss form, for a new policy (#0113BF1516) effective from July 28, 2008-July 28, 2009, in which she again listed the actual loss and damages as $67,000 (for her dwelling) and $72,000 (for her contents), for a total sum of $139,000. (Doc. 16-1 at 67-68 (Ex. A5)).

On December 3, 2008, State Farm notified Billingsley of a question as to whether there had been a material misrepresentation in the presentation of her claim and of the need for an examination under oath. (Doc. 24-2 (Ex. H)). As a result, on December 29, 2008, State Farm took an Examination Under Oath ("EUO") of Billinglsey, in which State Farm asked her about the bankruptcy filings and whether the information filed in those proceedings was true and accurate; she affirmed that the information was true and accurate. (Doc. 16-2 at 48-61 (Ex. D-EUO); Doc. 21-1 at ¶8 (Aff. Billingsley)). During the EUO, Billingsley testified that she did not make any other purchases after she moved into the trailer, but that her family "bought me stuff." (Doc. 16-2 at 52 (Ex.D-EUO at 38-39)). She also testified, in part, as follows regarding the contents of her home:

- she purchased a kitchen table and chairs from D&J Discount within the past two years for around $800;
- she had a dining room set that she estimated at $2,000;
- a set for the bedroom from Great American Furniture costing $3,000;
- in her living room area she had a three-piece table set that her mother-in-law gave her from her own house worth around $3,000;
- she arrived at a price of $450 for pictures because she said her mother-in-law "[buys] expensive stuff;"

9

- she had a cherry oak kitchen table set that she estimates at $3,000;
- she had a Phillips TV worth $300;
- she had a pair of Cross Trainer Eclipse Shoes worth around $100; and
- she had one big TV in her living room.

(Id. at 37, 40-44, 50, 52, 61, 63, 66-67, 89-90, 104).

Billingsley testified that her mother-in-law, Marie Billingsley, gave her some items in 2008 that were in the home at the time of the fire (one Phillips TV/DVD/VCR combo ($400 replacement value), a king-size full bed by Amari and king-size mattress by Celli) and that other unnamed people had given her "different things" as well. (Doc. 16-2 at Ex. C at 38-43 (Dep. G.Billingsley at 16-18, 20-21, 23)). Billingsley's mother-in-law testified that she "bought them a whole [lot] of stuff for their house[]" but could not remember when. (Doc. 16-2 at Ex. F at 66 (Dep. M.Billingsley at 12)).

Billingsley testified that between 2006 and 2008, she received from her mother-in-law a bedroom set (two night tables, a bed, a mattress and a dresser from American Furniture) and a three-piece living room set (coffee table included); she valued both "by looking at them" at $3,000 each; four pictures from Home Interior valued at $100 each; another kitchen table set from Harvesty valued at $3,000. (Doc. 16-2 at Ex. D at 52-57 (EUO at 39-42, 50, 59-60, 63-64, 66-68)). Billingsley testified that she had a 100 or so pairs of shoes, Intek dishes, baby clothing, about 200 pairs of jeans, and many other items. (Id. at 55, 57-58 (EUO at 58, 69-70, 76-77)).

At her deposition, Billingsley only produced one receipt dated February 14, 2008, showing that she purchased a living room set, three-piece coffee table set, dining room table and two lamps from D&J Discount in the amount of $1,636.90. (Doc. 16-2 at Ex. E). Billingsley also stated that she spent $10-15,000 per year on clothing. (Doc. 16-2 at Ex. D at 58 (EUO at 75)).

## II.     Jurisdiction

At the outset, the Court addresses State Farm's Response (Doc. 31) to the Court's *sua sponte*

Show Cause Order with regard to the propriety of federal diversity jurisdiction in this case (Doc. 29). After careful consideration, the Court finds that federal diversity subject matter exists. "[I]n declaratory judgment cases that involve the applicability of an insurance policy to a particular occurrence, 'the jurisdictional amount in controversy is measured by the value of the underlying claim–not the face amount of the policy.'" Hartford Ins. Co. v. Lou-Con, Inc., 293 F.3d 908, 911 (5th Cir. 2002). However, "under certain circumstances the policy limits will establish the amount in controversy. Specifically, the policy limits are controlling 'in a declaratory action . . . as to the validity of the entire contract between the parties.'" Id. Applying either measure the jurisdictional amount is met.

State Farm alleged in the complaint that the policy is void; thus the validity of the policy is at issue. The policy's limits are $120,300; the jurisdictional amount is satisfied.

However, even if we look to the value of the underlying claim, measured at the time the case was filed, jurisdiction is present. In Billingsley's November 7, 2008 Proof of Loss form, Billingsley asserted $139,000 as the full amount of loss ($67,000 dwelling and $72,000 contents), even though this is more than the face amount of the policy ($120,300). (Doc. 31-1). State Farm represents that it has already paid $13,929.42 to the mortgage company which held a mortgage on the Billingsley's property pursuant to the mortgagee clause such that Billingsley's claim would only be for the remaining balance ($125,070.58). Adding this sum to State Farm's repayment sum of $7,030.80, the amount in controversy then would be $132,101.38.[12] For these reasons, the Court is satisfied that the amount in controversy exceeds $75,000 such that federal diversity subject matter jurisdiction

[12] Even if the Court turned to the face amount of the policy ($120,300), the amount in controversy would be satisfied. The deduction of the $13,929.42 that State Farm paid to the mortgage company would result in a sum of $106,370.58, to which State Farm's repayment amount of $7,030.80 would be added, thus resulting in an amount in controversy of $113,401.38 (i.e., in excess of $75,000).

11

exists.

### III.    Summary Judgment Discussion

### A.    Standard of Review

Summary judgment should be granted only if "there is no genuine issue as to any material fact and [ ] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[13] The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The party seeking summary judgment always bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d

---

[13]  Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted:

> if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted).  The mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment.  Lofton v. Sec'y of the Dep't of Children & Family Serv., 358 F.3d 804, 809 (11th Cir. 2004), cert. den., 534 U.S. 1081 (2005).

## B.  Application

### 1.  State Farm's Claims against Billingsley

State Farm seeks a declaratory judgment that the policy issued to Billingsley for her mobile home and its contents is null and void due to her misrepresentations.  State Farm contends that Billingsley made misrepresentations after the fire loss to increase recovery of benefits set forth in her manufactured home insurance policy such that State Farm is relieved of any obligation to pay.  State Farm also seeks repayment of the $7,080.30 in benefits paid to Billingsley or on her behalf before discovering such misrepresentations.

#### a.  Judicial Estoppel

In support of its summary judgment motion, State Farm asserts that Billingsley is judicially estopped from claiming that she had certain personal property items in her home at the time of the fire because in 2007, as part of her bankruptcy proceedings, she only reported a limited amount of personal property as contents in her home. (Doc. 16-1 at Ex. A1 at 23-25 (Billingsley's Bankruptcy "Schedule B-Personal Property")).  When considering the applicability of the doctrine of judicial estoppel, courts consider two factors: 1) it must be shown that the allegedly inconsistent positions were made under oath in a prior proceeding and 2) such inconsistencies must be shown to have been calculated to make a mockery of the judicial system.  Burnes v. Pemco Aeroplex, Inc., 291 F.3d

13

1282, 1287 (11th Cir. 2002).  For the following reasons, Billingsley has not taken positions which are necessarily inconsistent, and her alleged inconsistences have not been shown to have been calculated to make a mockery of the judicial system.

The Bankruptcy Code provides that certain property owned by a debtor is exempt from the bankruptcy estate. 11 U.S.C. § 522. The exemption statute provides a list of federal exemptions, or provides that the individual states may set their own exemption schemes and provide that bankruptcy cases in those states be governed by the state exemption laws. Alabama has chosen to "opt-out" of the federal scheme and provide its own exemptions. See Ala. Code § 6-10-11.  Specifically, Alabama provides that a debtor such as Billingsley may exempt up to $3,000 in personal property in addition to necessary and proper wearing apparel, all family portraits/pictures and books used in the family:

> ...**[t]he personal property of such resident**, except for wages, salaries, or other compensation, to the extent of the resident's interest therein, **to the amount of $3,000 in value**, to be selected by him or her, **and, in addition thereto, all necessary and proper wearing apparel for himself or herself and family**, **all family portraits or pictures and all books used in the family shall also be exempt from levy and sale under execution or other process for the collection of debts.**...

Ala. Code § 6-10-6 (emphasis added).  This means that all of Billingsley's "necessary and proper" clothing (and that of her family members) as well as family portraits, pictures and books, are exempt.  Given these exemptions, Billingsley's inclusion of these items in her insurance claim but not in her bankruptcy proceeding is not inconsistent and moreover, she would have no motive to either disclose, or fail to disclose, such items in order to "make a mockery out of the judicial system."  Likewise, *in addition to these items*, Billingsley's personal property (to the extent of her

interest therein)[14] up "to the amount of $3,000" is also exempt. As such, the failure to disclose some of the items in her bankruptcy proceeding, that she now claims, may also be found to be without motive to "make a mockery out of the judicial system." Additionally, there is no indication in the record as to whether all of the household items belong to Billingsley alone, or to other family members.

Further, Billingsley's statements in the insurance claim form as to contents versus those in the bankruptcy form are not necessarily inconsistent, because each form elicited different information. As set forth in her bankruptcy petition, Billingsley was required to provide the "current value of debtor's interest" in the property (Doc. 16-1 at 23-25 (Billingsley's Bankruptcy-Schedule B-Personal Property)), for each item at the date of filing. See generally In re Barrows, 399 B.R. 506, 511 (Bkrtcy. D. Minn. 2009). In this regard, the "current value" of, for example, used furniture (which comprised much of Billingsley's household contents) is likely of little value on the market. In contrast, for State Farm's insurance claim forms, Billingsley was directed to provide the replacement cost for each item. (Doc. 16-1 at 69-82 (PPIF Forms)). So, for example, a $1,000 kitchen set may have been worth only $100 on the market but can only be *replaced* for $1,000. Because the "current value" of personal property, versus the "replacement cost" of personal property, are distinct values, Billingsley's representations – to the extent they diverge – are not necessarily "inconsistent positions."

For these reasons, it is **ORDERED** that State Farm's motion for summary judgment with regards to the issue of judicial estoppel is **DENIED.**

---

[14] In other words, only her (the debtor's) personal property is considered and must be disclosed – not her son or husband's property.

### b. <u>Misrepresentations</u>

State Farm contends that notwithstanding estoppel, Billingsley made material misrepresentations after the fire loss thereby voiding the insurance policy. Specifically, State Farm claims that Billingsley made material misrepresentations in an effort to defraud State Farm by inflating her contents claim and denying her poor financial condition (based on "the conflicting personal property values" she has provided "she overinflated personal property values for her own personal gain"). (Doc. 18 at 13). Billingsley denies having made any material misrepresentations. And while the Court acknowledges some discrepancies in Billingsley's deposition testimony and EUO, when compared with her Proof of Loss and PPIFs, these discrepancies hinge on a credibility determination (i.e., whether Billingsley is telling the truth) and accordingly, rest within the purview of the jury. What State Farm points to as "undisputed fact" in an effort to support its summary judgment motion are more akin to assumptions and inferences about Billingsley's income related to her ability to purchase ("Billingsley was in no financial position to purchase all the items she claimed" and "it is virtually impossible to believe that she spends $10,000 to $15,000 a year on clothing[]"), and moreover, these "undisputed facts" are disputed by Billingsley. For these reasons, genuine issues of material fact remain. As such, it is **ORDERED** that State Farm's motion for summary judgment with regards to its misrepresentation claim against Billingsley is **DENIED.**

### 2. <u>Billingsley's Counterclaims against State Farm</u>

In response to State Farm's Complaint, Billingsley asserted two counterclaims for breach of contract and bad faith. As to Billingsley's breach of contract counterclaim, State Farm's claim that she made false misrepresentations about the amount of content loss. Billginsley contends that State Farm's contention is "merely pretext" to deny her insurance claim. (Doc. 7 at 9). As such,

resolution of Billingsley's breach of contract counterclaim depends upon whether the State Farm

policy is deemed null and void due to her alleged contents misrepresentations, and thus, the

counterclaim must also proceed to trial. As such, it is **ORDERED** that State Farm's motion as to

Billingsley's counterclaims for breach of contract is **DENIED.**

With regard to Billingsley's bad faith counterclaim however, the Court finds that State

Farm's motion is due to be **GRANTED.** Specifically, Billingsley asserts that State Farm "has failed

or refused to act in good-faith by causing Defendant to become 'homeless' in its delay, denial, and

other tactics used to deny" her the "full contractual benefits resulting from the fire loss of which she

is entitled." (Doc. 7 at 10). Under Alabama law, a party can establish a claim for bad faith refusal

to pay a claim in two ways – "normal bad faith" and "abnormal bad faith." See, e.g., Mutual Service

Cas. Ins. Co. v. Henderson, 368 F.3d 1309, 1314 (11th Cir. 2004); Employees' Benefit Assoc. v.

Grissett, 732 So.2d 968, 976 (Ala. 1998); State Farm Fire & Casualty Co. v. Slade, 747 So.2d 293,

306 (Ala. 1999). Billinglsey's counterclaim does not allege abnormal bad faith and thus, the Court

is only concerned with "normal bad faith" in this case. Indeed, the evidence demonstrates that this

case is "the more normal [and ordinary] situation in which the factual dispute centers around the

reasonable, but conflicting, inferences that may be drawn from [the evidence]." Safeco Ins. Co. of

America v. Sims, 435 So.2d 1219, 1225 (Ala. 1983) (Jones, J., concurring).

In the "normal" bad-faith case,[15] the plaintiff must show the absence of any reasonably

---

[15] A party can establish "normal bad faith" or a claim for bad faith failure to pay an insurance
claim by establishing: 1) a breach of an insurance contract between the parties; 2) an intentional refusal to
pay the insured's claim; 3) the absence of any "reasonably legitimate or arguable reason for that refusal
(the absence of a debatable reason);" 4) the insurer's actual knowledge of the absence of any legitimate or
arguable reason; and 5) "if intentional failure to determine the existence of a lawful basis is relied upon,
the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or
arguable reason to refuse to pay the claim." Slade, 747 So.2d at 304; Grissett, 732 So.2d at 976;
Blackburn v. Fidelity and Deposit Company of Maryland, 667 So.2d 661, 667 (Ala. 1995); Henderson,

legitimate or arguable reason for denial of a claim. Slade, 747 So.2d at 306. In normal bad faith cases involving an insurer's refusal to pay an insurance claim, such as here, the Alabama Supreme Court has established the "directed verdict on the contract claim" standard. Blackburn v. Fidelity and Deposit Company of Md., 667 So.2d 661, 668 (Ala. 1995). In other words, a plaintiff must show that she is entitled to a directed verdict on the breach of contract claim in order to have the claim of bad faith submitted to a jury. Grissett, 732 So.2d at 976; Nat'l Sav. Life Ins. Co. v. Dutton, 419 So.2d 1357, 1362 (Ala. 1982). Thus, courts review whether there is a "legally sufficient evidentiary basis" for a reasonable jury to find for Defendants on the breach of contract claim. ALA. R. CIV. P. 50(a). "Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the ['normal' bad faith] claim must fail and should not be submitted to the jury." Dutton, 419 So.2d at 1362.

Accordingly, to survive summary judgment on her bad faith counterclaim, Billingsley must show that she is entitled to a directed verdict on her breach of contract counterclaim. Because factual issues remain with regard to the validity of her breach of contract counterclaim and thus, the legitimacy of the denial of her claim, see supra, Billingsley's "normal bad faith" claim must fail and should not be submitted to the jury. See, e.g., State Farm Fire & Cas. Co. v. Balmer, 672 F. Supp. 1395, 1403 (M.D. Ala. 1987) (finding, in relevant part, that "State Farm has asserted . . . misrepresentation after the fact (i.e., inflation of the contents inventory) as lawful bases for its refusal to honor the Balmers' claim under the policy. As to each of these defenses, this Court is of the opinion that the evidence produced at trial clearly demonstrates a fact issue with regard to the validity of the Balmers' claim under the policy. In other words, there exists herein conflicting

---

368 F.3d at 1314.

evidence as to whether the Balmers' claim under the policy is invalid on grounds of . . . misrepresentation after the fact. Given such conflicting evidence, the 'directed verdict on the contract claim' standard dictates that the Balmers' claim for the tort of bad faith should not have been submitted to the jury[]"). Thus, State Farm's motion for summary judgment as to Billingsley's bad faith counterclaim is **GRANTED.**

## IV.    Conclusion

Based upon the foregoing, the Court finds and it is hereby **ORDERED** that State Farm's Motion for Summary Judgment is **DENIED** in part and **GRANTED** in part as follows: **GRANTED** as to Billingsley's bad faith counterclaim and **DENIED** as all remaining claims, as detailed *supra.*

**DONE** and **ORDERED** this the **14th** day of **April 2010.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**